McCool, when you're ready. Thank you, Your Honor. Our appeal asks this to apply the requirements for proving invalidity of a patent. Opinions in Schumer, Cuito, Active Video, and many others require that an expert perform an element-by-element comparison explaining what each element entails and how each one is performed in the prior art. The defendant's proposed requirements in material ways and also fail to prove facts supporting the claim elements in all three of the alleged prior art references. Just looking at one example, mosaic with HTML combination, the totality of the expert testimony was one question and answer at pages 27, 25, and 26 of your appendix. Question, and does the combination of mosaic plus HTML plus render all of the claims obvious? Answer, I believe so. One leading question and a yes answer. Well, of course, you're starting with the low-hanging fruit, I think, on mosaic. That seems to me at least to be the weakest of the three different sets of perhaps you could address the other two areas. Let's move to BEOMA. Phillips was asked, what in BEOMA satisfies the essential type information requirement? His answer, that would be the name, plot.v, that is at the end of the information after the BOBJF. That was it. No Schumer comparison to what the elements require. No Schumer explanation of how plot.v might fulfill the requirements. And the undisputed evidence in this case was that VIOLA lacked that element. The patents couldn't be more clear. Type information is information about the kind of object data presented by the webpage. Is it video? Is it audio? Is it spreadsheet data? The Federal Circuit in the Microsoft appeal recognized that at page 1329 of the opinion. The only witness in this case to describe the operation of the VIOLA browser was the programmer Sylvie, and he did that at pages 2466 and 67 of your appendix. It's clear from reading those two pages about how it operates. The browser didn't utilize any information about the type of object data presented by the webpage. Well, it seems to me that the dispute over whether or not type information is satisfied comes down to your position that a file name is not type information. Am I right about that? Yes. Well, it seems to me one of the difficulties I have with that is that seems to be a claim construction issue, which was not before the court and not posited. So you're asking us to accept a definition of what type information is. As I said, it seems like a claim construction issue, which you never pressed. And so why wasn't the jury free to itself construe that type information was broad enough to cover file names, if that's what happened? Well, type information wasn't construed by the court. Right. It's in plain meaning of how the patent uses it. Well, it wasn't construed, and therefore it wasn't construed in a way that would exclude Sylvie as well. It has to mean type information. It has to mean something. Okay. And our position is that the defendants argue for the plain meaning of type information, and they say it can be a file, as your honor pointed out. But every dictionary defines type as a category of things with common characteristics. And more to the point, the patent says it explicitly. It says type information is a type of data. You can't read columns 13 and 15 of this patent and take away any other meaning for type information. It seems to me the argument you're making is really a claim construction argument and not a jury sufficiency of evidence. I mean, you're coming here and you're saying they misconstrued, whoever misconstrued, the trial judge didn't, but that the jury misconstrued what you say is the definition of type information, right? Well, yes, your honor. But it has to mean something. I mean, we can't say it could mean anything in the world. And type, that's the way the whole patent operates, is that it takes information about the type of object data that web page presents and it uses that to pair it with an executable application that will render that type of data. A video player for video data, an audio player for audio data. And so to just say it could mean anything would be, I mean, it's clearly got to mean something in the context. Well, I don't know that anybody's saying it could mean anything. The question is whether or not the is defined in this case as the browser taking the type information and looking for an executable application. Looking for it based on the type of data and running a file means that that identify and locate step is nowhere present. And it isn't present in Viola. The identify and locate step requires a pairing of a type of object data with a type of executable application that will run it. And the Microsoft opinion by the panel of this court in 2005 on this patent confirmed that reading of type information, that it talks about spreadsheet data and database data. Running a file says nothing about the type of data involved. And in addition, the embed text format requirement of Viola. The, in that particular, on that particular one, the embed text format has to specify the location of the interactive object. That's the data that actually appears on the screen. The defendants alleged that the What is the interactive object of Viola? Way at 2550, Sylvie at 2467. They both said, and it's unambiguous, three-dimensional coordinate system that displayed a wireframe airplane. In closing, at 3123, counsel for the defendants told the jury, you remember the jet fighter application? That was our three-dimensional embedded interactive object. But the defendants now recognize that that will work because the Viola tag doesn't say anything about the location of the jet fighter. And there's no type information associated with the airplane data. So defendants bring to this court the theory that plot.v was the interactive object. But there is zero trial evidence that plot.v is the object. Nobody said that. The defendants at page 35 of their brief cite to page 2698 suggesting Phillips said that. Plot.v is not mentioned on that page or either adjoining page. All of the testimony, all of the argument, counsel's argument makes it clear, is that the airplane program was the object. And that results in a decision on the defendants' plot.v theory and argument to this court. Changing the area of inquiry here for just a moment, how does the embed tag limitation of the patents relate to the It utilizes the embed tag. It specifically mentions the brackets HTML art. But column 14 points out that the invention is limited to the changes to the Mosaic browser and the embed tag. And the changes were something that weren't in either one. The changes were to have type information cause the browser to identify and locate an executable application. That wasn't in either one of those pieces of art. And that is the inventive leap with respect to these two patents. And if I could turn to media view, the third piece of art, it's easy to assess whether the evidence was sufficient here because it all came from Phillips. And it was very brief. When Phillips was asked to identify the embed tag format and type information in media view, he pointed to his slide 161. The court will find this at 2288 of your attendance. It was computer code and it was marked code from JDX 184. Phillips had stressed at page 27, 12, and 13 that this was prior art and, quote, it was impossible to modify. Two bits of script were highlighted on this code. He pointed to the word view cell and said that this is the embed text format. He pointed to the word TIF button and said this is type information. He gave no Schumer explanation of what they did or how they might practice the claim elements. We discovered after the trial, and the defendants now admit, that the code shown to the jury on that slide was written by Phillips in 2010 when he was working with the lawyers for the defendants to invalidate these two patents. So Phillips' testimony gave the jury the false impression of corroboration when there wasn't any, which is disqualifying itself under the barbed wire cases of Finnegan and Juicy Whip. And he identified the alleged elements in the code in code that was of prior art. He pointed to 2010 code and said that is type information, that is embed text format. It may have been, but he never testified about the prior art code that would be the only code that would be relevant to invalidate the patents. And we've since learned, when we looked at what the defendants said in the briefing it was identical to, that it's nothing like the patents. It displays static objects with no type information. It's all done internally. There's no external executable application. So turning finally to the distributed application requirement of four of the claims, all of the defendants' evidence on the distributed application missed the point. Every question and answer was to the effect that one machine could talk to another machine over a network. The defendants admit at page 37 of their brief that that was the evidence, but that's not what distributed application means. It's been construed by the court, quote, the executable application program must be capable of being broken up and performed on two or more computers, not sent from one computer to another over the network. The executable applications be performed simultaneously by two different computers and sent over a network. There's no evidence of the asserted prior art executable applications being capable of that. When we say executable applications, are you leaving out the category of executing an application on computer one and displaying the product of that execution on computer two? Well, that's what their evidence was. Right, but we're saying that doesn't constitute executable on multiple computers, according to you. Is that right? No, it's executable, but it's not distributed. Well, I should have said distributed, yeah. So you're saying that is not a form of distributed execution. No, no, the court's construction is clear. It's got to be performed on two executable applications. Well, that's where I'm going in, is to try to understand what the word performed means in this context. I mean, perhaps it's a term of art, but to me it doesn't seem clear, at least obvious, that displaying the product of the computing that is done on machine one, displaying that on machine two, is not distributing the performance of the application. And if it's not, why not? It's not because it's the executable application. The display on the computer is different. He's saying the program itself, the program, has to be broken up and performed by two or more computers. That's different than having the program performed on one and displayed on another. Thank you, Mr. McComb. Mr. Josephson. Good morning, and may it please the court. This court already held in the Microsoft case that EOLA was not entitled to judgment as a matter of law on the validity of these patents, because whether EOLA and the background knowledge of those skilled in the art anticipate or render the patents obvious presents questions of fact that this court permitted for a jury to consider. In this case, Judge Davis held that very trial, and the jury returned a general verdict of invalidity that supported on numerous different grounds, including, but not limited to, EOLA. Before I get into the details, one thing that's important to remember is that this is not just an anticipation case. During the opening argument, I heard almost nothing about obviousness. And for obviousness, of course, we look not just to Section 102 prior art, but also to the background knowledge of those skilled in the art, of which there was enormous testimony in this case, and about the motivation to combine the logical inferences and skill level of those in the art. And in this case, we had tremendous fact-witness testimony showing that everything that was claimed here was well within the knowledge of those skilled in the art, because the internet pioneers who created the actual prior art testified at trial that over the course of the summer of 1993, which is about a year before the patent application, people in the field figured out how to do this. They published to the entire web community how to do it, and they had active discussions about doing it, and actually did it, because they were trying to get the whole community to agree on a uniform standard. From a web browser's perspective, this doesn't work unless all the web pages worldwide actually use the same technology. So what happened was you had the entire worldwide web community figure this out, had done it, was working on a standard, and then in the meantime they just went and patented it. Well, you've referred to the this on a couple of occasions, and I think we need to get down into the details here, because one of the complaints that's made by the appellants is that there's a little too much of just referring with a wave of the hand to this being the technology in general, and not enough of where the limitations of the claims show up in the prior art. So maybe you could address first the type limitation question that Mr. McCool has said a considerable portion of his opening argument on. Certainly. So starting with Viola, which is one this court already addressed in Microsoft, the testimony that a file name can be typed information came from our expert and two of the fact witnesses. In particular, one thing he did not hear about yet is Pei Wei, who's the creator of the Viola web browser, and he testified, this is around page 2621 of the appendix, that in the example plot.v, plot conveys type information, information about the kind of the object, because it tells you if it is a plotting object, a modeling object. He similarly testified that in doodle.v, doodle would give you type information, because it would tell you that it's a drawing object. Now, Scott Silvey, who works with Pei Wei on Viola and created the Vplot application, he testified, and this is on page 2488, that the .v half of plot.v also tells you that it's a Viola object. So when you put them together, what you have is the file name plot.v telling you quite a lot of information about the kind of the object. Just as in modern parlance, for example, name.doc or name.pdf would tell you information about the type of the object. If it was a Word document or a PDF document. Here, plot.v, especially put together, gave you that information. And we do have, I should back up just a touch to stress that there's been a lot of discussion here about how we supposedly did not have element-by-element testimony. Well, our expert, Dr. Phillips, testified to Viola on an element-by-element basis for 19 pages of the trial transcript, and that's the element-by-element portion of that alone, did walk through all of that. And on type information, he testified after the fact witnesses. Normally, an expert has to describe the prior art, but you don't have the actual traders of all of the prior art references there at trial. In this case, before he testified, we'd already heard from the trader of Viola, the trader of Vplot, the trader of the Mosaic web browser, the trader of the prior art of Medtag that they modeled their invention on. And so, after those other fact witnesses testified, Dr. Phillips was able to build on a lot of that prior fact witness testimony, including the testimony that we just discussed. Can I return for just a moment, I don't want to hold you too long on this, but to the type information. The word type, admittedly, there isn't a whole lot here of guidance in either the patent and obviously no claim construction, but the word type suggests some degree of genericness. And this is an argument that's made by Ilyas, that plot.v is not a generic. Is it your argument that the .v is the generic part? I wasn't clear whether you were saying the plot part is generic or the .v is generic or both are generic. Which part of that, or both, refer to some class of possible files? As would be the case if you were looking at .pdf or .jpeg or something like that. I think the jury could reasonably find, based on the testimony that they each did. Now, what we know, though, I don't know that you really need a class, because first we fully agree with Judge Prost, because this is an attempt to dress up a fact question as a claim construction. It's much too late to seek an appeal. And there are, of course, a couple of cases on that point. Well, let's assume that we conclude from the patent that type is not simply the name of a particular file. What is it about plot.v? You alluded to the .v as showing a type of file, that is to say a violent file. And the plot. I mean, Peiwei testified that the plot gives you information about the type of the file. It is a plotting file. It's a file that does plotting, just as doodle.v would be a drawing file, and a volume would be a file related to volume. Those are some of the examples that he gave. The .v, we also know from Scott Silvey, the creator of vplot, is analogous to the .pdf. But what the claim language tells us is that the type information is associated with the object, and that the system can use it to identify and locate the object. So apart from the generality that we'll type each kind, that's what we know. The name of an object is certainly associated with the object, and although a name might not inherently convey type information, when you have the name of a computer file, it tends to convey a lot of information about the file. And the testimony here is that plot.v gave you that information. Now that brings us into their argument about, well, you also need, the computer needs to be able to identify and locate the object from the embed tag and the information, and the type information. Right. Well, I thought that had been undisputed at trial, because everyone agrees that what you have in that tag is the path and file name that takes you right to it. For some of their other arguments, they complain, well, that's the problem. Well, what is the option in your view here? It is, and this is the next very important point, there are in the, to give in the plot.v example, the type information is the name plot.v. The object is plot.v, and then the executable application is vplot. Judge Davis recognized that in his decision, and they said there was no testimony whatsoever about plot.v being the object. What I can point you to is two things. Well, so, to be clear here, you're saying that the object here in the example of the jet plane is not the jet plane? Well, no, the thing is plot.v and vplot work together to put the jet plane on the screen. Right. Plot.v is a file. Right. Vplot is an application, and the way it works is that, the VOPJF tag, the embed tag in VOL, would automatically launch plot.v. Right. And vplot in turn, and plot.v in turn would automatically launch vplot. So, the plot.v and vplot aren't, you know, rigidly separable in that sense. They together, they put the jet plane on there. Right. But the object is essentially the computer file, as they say data. Although the specification is important too. In this instance, the object plot.v combines data, the object data, with also an executable component. And the specification specifically says that's fine, that objects can include executable code as well as data. That's the appendix 34, column 3, lines 39 to 40. But in terms of their point that there was no testimony, and we're just making it up now, that plot.v is the object. Scott Silvey, the creator of vplot, who worked with Pei Wei on Viola, specifically testified on H2488 that plot.v was an object. And then our expert Dr. Phillips, building on the fact with his testimony, specifically explained that the type information at issue would help find plot.v, which means that plot.v was the object, which works with the type information, provides the object, and launches the executable application. And that's how it all parses, and the evidence is there. And this evidence, remember, it's not just that we have to assume the jury found the fact when it says to be credible. It's that they were talking about their own prior art. The jury didn't have to hear this from paid experts. We had all of the prior art defenders right there discussing their own prior art and explaining it. Now, also in terms of Viola, I think when they came back later to distributed application, I mean, we fully agree with you, Judge Bryson, that in the term distributed application, which appears in four of the claims, is defined by the court as an application, an executable application that's capable of being broken up and performed among two or more computers. So being run on one and displayed on another means it's being performed on the two. It's a matter of just parlance, and the witness testimony would certainly be sufficient for that. But we also know from witness Eric Bina, who was the co-creator of the Mosaic web browser and later the founder of Netscape, he testified that on the X Windows system, which is the system at issue here for running Viola, the platform for running Viola, he testified specifically, this is something else you were told didn't exist on the record, that in X Windows, multiple computers could run and then send information to another computer. So even if you needed two in one, Bina said you have that in X Windows, and that's in appendix page 22, 42. Also, though, there's no such requirement, which we noticed on the face of the patent. Most of the claims talk about at least one client computer and at least one server, not two. And when you go through the specification, look at figures five and six, for example, they give one embodiment where there's a client computer and a server, and other embodiments where there's a client computer and multiple computers. So in other words, there's just no basis for this made-up plain construction that they're now asserting on appeal. But in any event, we have the evidence in the record from Eric Bina that it would be satisfied in any event. That's probably a full rebuttal on anticipation by Viola. But even apart from Viola, the fact of the matter here is that it's obvious. And the basic point about obviousness is this. Let's look at what they did. Stop saying this. Let's look at what they did. They took a prior web browser, Mosaic, that was capable of embedding static objects right in the web page. And it was also capable of pulling up interactive objects, except that it would launch them in a separate window. And so what the invention was, was to launch embedded interactive objects within the browser-controlled window in the same way that static objects already were. Now, how did they do that? They did that by combining the prior web browser with Dave Ragget's prior web embed tag according to its intended purpose to produce its intended effect, which was to launch embedded objects within the browser window. So, as a matter of law under KSR, combining two pieces of prior art for their intended purpose and effect, which I can certainly find as obvious, but even apart from that, the jury heard overwhelming evidence that over the course of the summer of 93, about a year before the patent applicant, numerous people had been discussing this and putting it within the knowledge of those skilled in the art. So, for example, Hayway started it in May of 1993 with the Viola browser. Dave Ragget testified that that inspired him to create his embed tag to take that technology across web browsers more generally. And so he proposed his embed tag as a modification to the HTML specification. HTML is the language of the World Wide Web, so he was trying to get it standardized across. He sent that email to the World Wide Web community through an email listener called www-talk. Shortly thereafter, there was a 1993 web conference called the World Wide Web Wizards Workshop where interactive objects were an agenda item. And at that workshop, Hayway again demonstrated Viola, this time to Eric Bina, who was the co-author of the Mosaic browser and later the founder of Netscape. And Bina testified that he was so impressed that he needed that, he went home and added it to his version of Mosaic. There was also another email just before all of this in 1993 posted to the web by the co-author of another one of the web browsers at the time where he said, there was no object to embedding interactive objects in line with web pages. And he went on to describe how to do it. That prompted someone else on that list server to write back saying, you're right, I just did it and it works. So what you had by the end of 1993 was this technology that they copied, the Mosaic plus the embed tag put together for their embedded purpose. You had exactly that being discussed publicly among those of skill in the art. In terms of the specific examples of obviousness, they all boil down to essentially an embed tag and a web browser being put together. I mean, every combination does that because that's the invention at that point. But I should emphasize though that on MediaView, they're being terribly unfair to our witness, Dr. Phillips, who was the creator of MediaView. And he did testify on an element-by-element basis and also more generally about MediaView's operation. That was heavily corroborated by three contemporaneous articles he'd written about it that are in the record and show how it worked by the code being in the record and by video demonstrations from back in the 90s of MediaView that are in the record. And with respect to them saying, and their main argument now seems to be that the TIF button was not type information, apart from the fact that he testified that it was and apart from the fact that they did not cross-examine him on it, their main argument seems to be that it's demonstrative that he used to demonstrate the illustration of the assault should not be believed because it's fabricated. I mean, I hope the brief logs are this well enough, but there is no fabrication of evidence. There is a labeling error on that demonstrative, which is not in evidence anyway. The actual code he was talking about is in the record. It was admitted and is in the record. And our point is simply that the demonstrative, which did contain the wrong code for some reason, and the actual code that's in the record, they're materially identical for this purpose because they show the same functioning, which, as the witness testified, shows that the view cell and bed text format here worked in, he said, I think, exactly the same way, Dr. Phillips, as the view of BJF and MedTech and Viola that he'd already testified about at some length. So the jury here heard, on all of these matters, an enormous amount of evidence from the actual prior art inventors. Okay. Thank you, Mr. Josephin. Thank you. Mr. McCullough, we'll restore the rebuttal time so we can hear all the arguments. Thank you, Your Honor. Let me go first to the last point the defendant's lawyer made, and that is with regard to the labeling error. That makes no sense to us. What they told Judge Davidson, what they're now saying to you, is that he meant to label that slide as containing 2010 code. That's totally irrelevant and would have been completely improper. So the labeling error argument makes zero sense. Let me go to Viola. They go to Sylvie's testimony. Sylvie never said that plot.v was the interactive object of the patent claims. Sylvie said it wasn't. Sylvie said that .v files are, quote, external, executable applications. You'll find that at the top of page 2466. You heard counsel say plot.v rendered the data. That's what executable applications do. The data itself is the object. The rendering element is the executable applications, just like Sylvie said. Viola can't anticipate this patent unless that airplane demo is the interactive object. And we know that there's nothing in Viola that specifies the location of that airplane demo. They've never argued that there was anything. In fact, they dropped it and changed what they said was the interactive object. So what Sylvie said, and recall this, they're now claiming and they're continuing to argue that plot.v is the interactive object. Everybody that testified for the defendants said it wasn't. Sylvie said it was the executable application. Sylvie Way and their counsel to the jury said it was the airplane demo. That doesn't work. That doesn't anticipate. Now, going to the MediaView articles just briefly, there's nothing on those MediaView articles which goes in to the architecture of the way the system works. They're basically PR pieces which talk about generally the viewer capabilities of the art, not how it operates operationally. Nothing in those articles address a feature that specifies the location of an object. Nothing in there talks about a feature that specifies type information associated with an object. It never even mentions anything called TIFF button, which is, in the defendant's theory, an essential element for this art to read on to these patents. Let me finally say, with regard to counsel's arguments, that all of this was so obvious to the industry, and everybody knew it. The two gentlemen that he talked about, Mr. Vena, who was the Mosaic creator, and Mr. Raggett, who was the HTML Plus creator, both talked away from exactly what these patents did. Mr. Andreessen, Vena's co-creator, said, do not embed interactive objects in Mosaic pages. That's at page 2868. Mr. Raggett's HTML Plus specification at page 9516 says, whatever you do, do not use the embed tag, which is what they claim is the element from his art that would go into the combination, to embed interactive objects. That at page 9516. None of this was so obvious to any of these gentlemen. This case involves a failure of the defendant's evidence to do what this court requires. It's no different than the Daubert requirements, or this court's rigor requirements, with regard to proving damages. You've got to come up with a certain level of evidence for the fact finder to base a decision on. And that wasn't done here. Thank you, Mr. McCool, and thank you, Mr. Joseph, for the cases taken under submission.